# United States District Court, Northern District of Illinois

(10)

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1242 | **DATE** | 5/25/2001 |
| **CASE TITLE** | Christine F. Stauffer etc. Vs. Westmoreland Obstetric etc. et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. All defendants now move to dismiss the complaint. Their motions are granted in part and denied in part. Status hearing set for June 20, 2001 at 9:45am.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 2 9 2001 | 50 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | ls | |
| | Mail A 450 form. | ⊕ | docketing deputy initials | |
| | Copy to judge/magistrate judge. | ED-7 FILED FOR DOCKETING | | |
| | | 01 MAY 25 PM 3: 40 | date mailed notice | |
| WAH | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHRISTINE F. STAUFFER f/n/a )
CHRISTINE F. SKORBERG, )
                                )
           Plaintiff, )
                                )
      vs. )    No. 00 C 1242
                                )
WESTMORELAND OBSTETRIC AND )
GYNECOLOGIC ASSOCIATES, S.C., HUGH )
FALLS, WILLIAM GARDNER, SCOTT )
LOGAN, CHUHAK & TECSON, P.C., )
ALBERT L. GRASSO, ESQ., LEAF, DAHL )
AND COMPANY, LTD., BENJAMIN ROBERT )
LEAF, )
                                )
          Defendants. )

DOCKETED

MAY 2 9 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Christine F. Stauffer ("Stauffer") is a physician and former member of Westmoreland Obstetric and Gynecologic Associates, S.C. ("Westmoreland"). Stauffer claims that when she left Westmoreland in February 1999, she was owed more than $800,000 in stock and deferred compensation. Westmoreland has not paid Stauffer what she claims she is owed, and therefore she has filed a nine-count complaint against Westmoreland, its physician members, its attorneys and its accountants. All defendants now move to dismiss the complaint. For the reasons set forth below, their motions are granted in part and denied in part.

## BACKGROUND

Stauffer entered into an employment agreement with Westmoreland on March 3, 1990 ("1990 Employment Agreement"). This agreement set the terms of Stauffer's employment and also provided Stauffer an option to purchase an ownership interest in Westmoreland after



three years at the practice (cplt.exh.1). Stauffer claims that,[1] in addition to the 1990 Employment Agreement, two other documents were relevant to her relationship with Westmoreland from the start: the 1989 Stock Purchase Agreement and the 1989 Unfunded Deferred Compensation Agreement (cplt.exhs. 2, 5). These two contracts governed the rights of shareholders in the practice. Stauffer owned no stake in Westmoreland when she began working there and thus was not a party to these agreements. As part of the 1990 Employment Agreement, however, Stauffer was told that if she were to become a shareholder, the 1989 agreements obligated Westmoreland to buy back her shares plus interest in the event of her departure from the practice.

Sometime prior to August 1993, Stauffer and Westmoreland decided to renegotiate their relationship. On August 1, 1993, Stauffer and the three physician shareholders of the practice, defendants Hugh Falls, William Gardner, and Scott Logan (the "doctors" or "doctor defendants"), reached an oral understanding modifying some of the terms of the 1990 Employment Agreement. Specifically, the parties orally agreed that Stauffer would become an equal shareholder in the practice as of August 1, 1993. They also agreed that Westmoreland would buy back Stauffer's shares for the amount she paid for them plus 6 per cent annual interest if she were ever to leave the practice. Although the terms of this 1993 Employment Agreement were not reduced to writing, Stauffer says that the doctor defendants personally guaranteed the arrangement. Subsequent to August 1, 1993, Stauffer purchased 250 shares in Westmoreland for $258,327 and thereby became an equal partner in the practice.

Stauffer continued to practice medicine at Westmoreland for the ensuing several years.

---

[1]On a motion to dismiss, we take as true all facts alleged in the complaint and construe all reasonable inferences in plaintiff's favor. *See* Dawson v. General Motors Corp., 977 F.2d 369, 372 (7th Cir. 1992).

In late 1998, Stauffer informed her colleagues that she had decided to leave the practice and move to Colorado. In the subsequent negotiations regarding her departure, Stauffer learned of two contracts formed the previous year: the 1997 Stock Redemption Agreement and 1997 Deferred Compensation Agreement. The doctor defendants informed Stauffer that these two agreements modified the 1989 Stock Purchase Agreement and 1989 Unfunded Deferred Compensation Agreement, respectively.[2] Stauffer had not signed the two 1997 agreements.[3] Upon learning of their existence in December 1998, however, Stauffer assumed that the 1997 agreements did not alter the valuation of her stock and deferred compensation. Stauffer soon discovered she was wrong. On February 1, 1999, Westmoreland sent Stauffer a letter suggesting that it would not be calculating her stock value as equivalent to her original contribution plus 6 per cent interest (cplt.exh. 3). Stauffer's resignation from Westmoreland became official on February 28, 1999. On March 15, 1999, Westmoreland's accountant, defendant Benjamin Robert Leaf of Leaf, Dahl and Company, Ltd. (collectively "Leaf"), informed Stauffer that she would receive $29,753 for her shares under the 1997 Stock Redemption Agreement and $128,864 in benefits under the 1997 Deferred Compensation Agreement, for a total of $158,617 (cplt.exh. 6). Stauffer was surprised and upset by these numbers. She had contributed $258,327 to purchase her stock in 1993 and believed that she was owed at least that much plus interest for her 250 shares. She also believed that Westmoreland owed her substantially more than $128,864 in deferred compensation.

Stauffer protested, but Westmoreland stood by its figures. Stauffer says that the

---

[2]Staffer had become an official party to the 1989 Stock Purchase Agreement when she executed an amendment to that contract on May 1, 1996 (cplt. exh. 9).

[3]Indeed, Stauffer claims that she did not even receive copies of the 1997 agreements until early 1999.

defendants subsequently led her to believe that if she transferred her 250 shares back to Westmoreland, she would receive the $158,617 (in 12 installments) while maintaining the right to contest the matter. On April 1, 1999, Westmoreland sent Stauffer one payment of $10,739. On April 14, 1999, Stauffer wrote a letter to Westmoreland stating that she had lost her original stock certificate but that she owned 250 shares in the practice and was transferring those shares to Westmoreland while reserving "the right to contest the consideration paid" by Westmoreland (cplt.exh.4). Stauffer expected that Westmoreland would respond by continuing to pay her the $158,617 it claimed was owed. Instead, on April 19, 1999, Westmoreland's attorney, Albert J. Grasso of Chuhak & Tecson, P.C. (collectively "Grasso"), wrote Stauffer back to inform her that Westmoreland would cease making any further stock or deferred compensation payments pending resolution of the dispute (cplt.exh.10). To date, Stauffer has received only $10,739 in connection with her departure from Westmoreland.

Stauffer initiated this lawsuit, *pro se*, on February 28, 2000. On July 27, 2000, we granted defendants' motion to strike the original complaint under Rule 8(a) but provided Stauffer with some time to cure the defects in her pleading. She has since retained counsel and filed a nine-count amended complaint. Stauffer alleges that all of the defendants (Westmoreland, the doctors, Leaf and Grasso) are liable for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (count III), the Illinois Securities Law of 1953, 815 ILCS 5/12 (count VIII), and for common law fraud (count IV). Against Westmoreland and the doctor defendants, Stauffer also alleges breach of contract (count I), conversion (counts II and IX), intentional infliction of emotional distress (count V), and violation of the Illinois Business Corporation Act, 805 ILCS 5/7.75 (count VI). Finally, Stauffer seeks to hold the doctor

defendants personally liable for the conduct of Westmoreland (count VII).

Defendants now seek to dismiss Stauffer's amended complaint. In their motion Westmoreland, Grasso, and the doctor defendants argue that Stauffer's lawsuit, at bottom, is a breach of contract case and therefore counts II-VI and VIII-IX should be dismissed under Rule 12(b)(6). They further assert that late service dooms Stauffer's claims against Grasso under Rule 12(b)(5), and that Rule 8(a) pleading deficiencies continue to plague counts I and VII. Leaf has filed a separate motion to dismiss, arguing that the three counts raised against it – counts III, IV and VIII – fail to state a claim under Rule 12(b)(6). Defendants concede that there may be enough merit behind at least some of Stauffer's claims to survive the motion to dismiss stage. And we agree that the story as told by Stauffer clearly constitutes a foundation on which to build a case. The complaint nevertheless contains much clutter, and for this and other reasons, defendants' motions to dismiss are granted in part and denied in part.

## DISCUSSION

### I. Conversion

In count II of the complaint Stauffer alleges that Westmoreland and the doctor defendants wrongfully converted the value of her 250 shares of stock. Admitting that the allegations contained in her complaint are not very clear, Stauffer elaborates on this cause of action in her brief. Stauffer explains that count II is based on two somewhat distinct theories regarding defendants' alleged conversion of her stock. First, Stauffer claims that Westmoreland and the doctor defendants accepted her 250 shares of stock on April 14, 1999, but have not paid her the $29,753 they claim those shares are worth or the $158,617 they had promised in exchange for the shares, despite her demands on them to do so. Second, Stauffer

asserts that she contributed $258,327 for the 250 shares in 1993 and was told that Westmoreland would maintain that money in a separate account. Stauffer claims that Westmoreland and the doctor defendants have converted those funds by failing to return the $258,327 plus 6 per cent interest as the parties had agreed.

In order to state a cause of action for conversion under Illinois law, a plaintiff must allege: "(1) an unauthorized and wrongful assumption of control, dominion, or ownership by a defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property." Colonial Funding, L.L.C. v. American Empire Surplus Lines Ins. Co., 719 N.E.2d 1098, 1100 (Ill. App. 1st Dist. 1999). Here, Stauffer claims that Westmoreland and the doctor defendants have wrongfully converted the value of her stock. As we recently explained:

> Illinois law limits the circumstances under which money can be the subject of a conversion claim. Generally "conversion will not lie for money represented by a general debt or obligation." If the money at issue is "capable of being described as a specific chattel," however, then it may serve as the basis of a conversion claim. In order to state a claim of conversion based on money, plaintiff must allege that it has a right to a specific, identifiable amount of money; a claim of right to an indeterminate sum of money sounds in debt rather than in conversion.

3Com Corp. v. Electronic Recovery Specialists, Inc., 104 F.Supp.2d 932, 939-40 (N.D. Ill. 2000) (citations omitted).

The allegations as described in Stauffer's brief would satisfy the pleading requirements for a conversion claim under Illinois law. Under her first theory, Stauffer claims that Westmoreland and the doctor defendants took her 250 shares of stock and have not returned

the shares or what they claim is their cash value ($29,753 or $158,617) to Stauffer even though she has made a demand on them. Stauffer's second theory is that Westmoreland and the doctor defendants are wrongfully withholding her original contribution of $258,327 plus interest. Both theories designate a specific chattel or sum of money as being converted. *See* 3Com, 104 F.Supp.2d at 940 ("Courts allow claims of conversion to go forward where the allegations indicate that the sum of money at issue was segregated from other funds, received in a lump sum, earmarked, or otherwise identifiably distinct.") (citations omitted)). Thus, the elements of a conversion claim are met. Westmoreland and the doctor defendants counter that there can be no conversion because Stauffer voluntarily relinquished the 250 shares to Westmoreland in her April 14, 1999 letter.[4] Defendants miss the point. Stauffer did not give her shares away. Rather, she transferred her stock for a specific (albeit disputed) amount of money (while reserving the right to contest the matter). In short, Stauffer claims that Westmoreland and the doctors have taken her stock without paying for it and/or have deposited her $258,327 contribution into an account and are refusing to return it. This is enough to allege conversion under Illinois law. Accordingly, we dismiss count II without prejudice and allow Stauffer to resuscitate that count with the factual allegations set out in her brief.

Count IX also alleges conversion. The subject of that claim is Stauffer's individual retirement account (IRA). Westmoreland had maintained Stauffer's IRA while she worked at the practice. Stauffer claims that on August 29, 2000, she asked Westmoreland to transfer

---

[4]Defendants also contend that since Stauffer lost her original stock certificate, there was no valuable property to convert in the first place. But Westmoreland accepted Stauffer's April 14, 1999 statement in lieu of the actual stock certificate, and executed a document on that date officially redeeming Stauffer's 250 shares (cplt.exh16). Thus, the lost stock certificate is not important.

her IRA funds to an account she had established with Charles Schwab & Co. Westmoreland did so the next day. Soon after, Stauffer learned that Westmoreland had transferred only $187,573.21 to her new account. Stauffer believed that she had much more than that in her IRA and inquired into the discrepancy. She learned that because she had withdrawn the funds prior to the end of the calendar year (*i.e.*, before December 31, 2000), she had forfeited the year-to-date profits on her IRA. Thus, she received the balance of her IRA as of December 31, 1999, rather than the value of her account on August 29, 2000.

As presently alleged, count IX claims that Westmoreland and the doctor defendants unlawfully converted the profits that had accrued on Stauffer's IRA from January 1, 2000 to August 29, 2000. In her brief, Stauffer admits that ERISA, and not state law conversion, is the appropriate legal vehicle through which to allege this issue. She therefore asks us to dismiss count IX without prejudice so that she may raise the claim in its proper legal context. Westmoreland and the doctor defendants have no real objection, other than to voice their frustrations with Stauffer's mispleading. Without passing on the validity of the purported ERISA claim, we dismiss count IX without prejudice.


## II. Fraud Related Claims

In counts III, IV and VIII, Stauffer accuses all of the defendants of making a number of false statements regarding the value of her shares. Specifically, Stauffer cites the following categories of alleged misrepresentations: (1) on March 3, 1990, Westmoreland and the doctor defendants orally informed Stauffer that the 1989 agreements would govern her employment relationship and that those agreements provided that if she became a partner in Westmoreland

she would receive her original contribution plus interest in the event of her departure from the practice; (2) on August 1, 1993, Westmoreland and the doctor defendants orally confirmed that the 1989 agreements governed, and further stated that under those agreements Stauffer would receive her $258,327 contribution plus 6 per cent annual interest if she were to leave the practice; and (3) between December 1998 and April 1999, by both oral and written statements, defendants informed Stauffer that the 1997 agreements trumped the 1989 agreements, that under the 1997 agreements her stock value and deferred compensation amounted to $158,617, and that if she transferred her 250 shares to Westmoreland she would receive $158,617. Stauffer contends that she joined the practice in 1990, bought into the partnership in 1993, and sold her 250 shares in 1999, all in reliance on these alleged misrepresentations. We find it useful to keep the different categories of statements in mind as we discuss the three counts that are based on them.

## A. Securities Exchange Act

Count III alleges that defendants violated Section 10(b) of the Securities Exchange Act and related SEC Rule 10b-5 by making the statements described above. Among other challenges, defendants argue that count III fails on statute of limitations grounds. We agree.[5]

---

[5]Stauffer's cause under the Securities Exchange Act in count III, as well as her claim under the Illinois Securities Law in count VIII, are also subject to attack on the grounds that her 250 shares in Westmoreland do not constitute "securities" as that term is defined under the federal and state securities laws. See S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946) (federal securities laws apply only to passive investments by which the investor receives profits from the efforts of others); Doherty v. Kahn, 682 N.E.2d 163, 169-70 (Ill. App. 1 Dist. 1997) (same under Illinois Securities Law). Defendants claim that Stauffer's shares were not "securities" because Stauffer was more than just a passive investor in Westmoreland. They point out that Stauffer's efforts contributed to the practice's profitability. Defendants are correct in that general partners typically do not own "security" interests in the partnership. See Giuffre Organization, Ltd. v. Euromotorsport Racing, Inc., 141 F.3d 1216, 1219 (7th Cir. 1998); Cogniplex, Inc. v. Ross, 2001 WL 436210, at *8-10 (N.D. Ill. Apr. 27, 2001). Questions remain, however, regarding whether and to what extent Stauffer exercised a degree of control over the practice. See Williamson v. Tucker, 645 F.2d 404, 424 (5th Cir.) (holding that a partner without meaningful managerial power may be covered by the securities laws), cert. denied, 454 U.S. 897 (1981); Cogniplex, 2001 WL 436210, at *8-10. According to the pleadings, Stauffer was

A claim brought under Section 10(b) or Rule 10b-5 must be brought "within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991). The first two categories of alleged misrepresentations occurred in 1990 and 1993, respectively, and therefore clearly fall outside of the three-year statute of repose. Thus, they are not actionable representations under the federal securities laws.

The viability of the third category of statements depends on whether Stauffer had "inquiry notice" of the alleged fraud more than one year prior to filing her lawsuit.[6] Under the inquiry notice doctrine, the "one-year statute of limitations ... begins to run not when the fraud occurs, and not when the fraud is discovered, but when ... the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year." Fujisawa Pharmaceutical Co., Ltd. v. Kapoor, 115 F.3d 1332, 1334 (7th Cir. 1997). "Suspicious circumstances, coupled with ease of discovering, without the use of legal process, whether the suspicion is well-grounded, may cause the statute of limitations to start to run before the plaintiffs discover the actual fraud ... ." Law v. Medco Research, Inc., 113 F.3d 781, 786 (7th Cir. 1997).

Stauffer filed her lawsuit on February 28, 2000. Thus, the question is whether she had inquiry notice of the alleged misrepresentations by February 28, 1999. The facts show that she

_____

not an officer of Westmoreland, did not participate in management decisions, and did not sign or even have access to important partnership documents. Thus, it is too early to decide whether Stauffer's shares qualify as protectable "securities."

[6]This third category of alleged misrepresentations fails to support Stauffer's federal securities fraud claim for the additional reasons stated in part II.C below.

did.  In December 1998, Stauffer discovered that the 1997 Stock Redemption Agreement and

1997 Deferred Compensation Agreement may have modified the 1989 Stock Purchase

Agreement and 1989 Unfunded Deferred Compensation Agreement.  Although she states that

she did not know at the time that the 1997 agreements had altered her share value, Stauffer

did know that the 1997 agreements were critical in that they established the method by which

Westmoreland would calculate the value of her shares.  Indeed, Stauffer admits in her

complaint that she began to suspect foul play when she learned of the existence of the 1997

agreements.  She alleges in paragraph 109 that "in December of 1998" she was first put on

notice "of facts that previous Defendants' statements and representations in connection with

the two sales of her securities were possibly untrue"(cplt.¶109).  Stauffer has made similar

concessions in previous motions filed with this court.[7]  Thus, the alarms regarding defendants'

statements were first set off in December 1998.

Less than two months later, Stauffer received a letter from Westmoreland which

further suggested to her that something may be awry.  In that letter, dated February 1, 1999,

Westmoreland informed Stauffer that Grasso and Leaf would be preparing the documents and

calculations necessary for the transfer of Stauffer's 250 shares to the practice (cplt.exh.3).

Attached to the letter was an outline of the terms upon which Westmoreland planned to

purchase the shares.  The attachment stated that "the agreed value of your shares shall be

_____

[7]On September 13, 2000, Stauffer submitted a motion for leave to file an amended complaint, which stated that "Stauffer first had notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of [the Illinois Securities Law] around the middle of December 1998.  This is the first time she was told by anyone that she was not going to receive back from the Corporation exactly the same amount of money she had paid for her stock shares, with interest, as she had always been told by all the other doctors/shareholders" (def.reply exh. 1).

$2000" and went on to state that an "additional amount to be agreed upon by counsel for both parties after their appropriate review of the financial records of the Corporation will be payable to you ... at such times as may be mutually agreed by counsel." Stauffer's understanding had been that she would receive at least her $258,327 contribution plus 6 per cent annual interest for the 250 shares. The representations contained in the February 1, 1999 letter were at odds with this understanding. This should have raised another red flag for Stauffer. In short, the 1997 agreements and the February 1, 1999 letter constituted the sort of "suspicious circumstances" that would put a reasonable person on notice of potential fraud.

Stauffer argues that she was not on inquiry notice until March 15, 1999, because that was the date on which she learned that Westmoreland planned to pay her only $29,753 for the 250 shares and $158,617 in total compensation. Stauffer may not have been aware of the precise amount Westmoreland proposed to pay until March 15, 1999, but she had enough facts in December 1998 and February 1999 to put her on inquiry notice of the alleged misrepresentations regarding her stock value. Thus, count III is dismissed as time-barred.

B. Illinois Securities Law

Count VIII alleges fraud under Section 12 of the Illinois Securities Law of 1953, 815 ILCS 5/12. Rescission is the only remedy available for a violation of Section 12. Kleban v. S.Y.S. Restaurant Management, Inc., 912 F.Supp. 361, 368 (N.D. Ill. 1995). In order to take advantage of this remedy a plaintiff must satisfy the six-month notice provision contained in Section 13(B) of the statute: "Notice of any election [to rescind] shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable ...." 815 ILCS 5/13(B). Stauffer admits that she has not

filed such a rescission notice (cplt.¶113). Usually, failure to plead compliance with the six-month notice rule is fatal to a Section 12 claim. *See* Reshal Associates, Inc. v. Long Grove Trading Co., 754 F.Supp. 1226, 1236 (N.D. Ill. 1990); Wislow v. Wong, 713 F.Supp. 1103, 1107 (N.D. Ill. 1989). Some courts have allowed plaintiffs to substitute their complaint in lieu of a rescission notice, Ashenden v. Lloyd's of London, 1996 WL 717464, at * 4 (N.D. Ill. Dec. 9, 1996) (citing cases), but Stauffer does not pursue this route either. Having neither filed a rescission notice nor included remedial allegations in her complaint, Stauffer's prospects with regard to her Illinois Securities Law claim are dim.

Stauffer presses forward, nevertheless, asking us to excuse her failure to file a rescission notice because, she says, defendants have wrongfully refused to produce certain documents and thereby have obstructed her ability to determine whether the securities transactions at issue in this case are voidable (cplt.¶¶106-113). The pleadings indicate, however, that Stauffer knew of her state securities law claim more than six months ago. In December 1998, Stauffer had notice of facts indicating that defendants' "statements and representations in connection with the two sales of her securities were possibly untrue" (cplt.¶109). By February 1999, Stauffer knew that defendants had changed the way they would be calculating her stock value (cplt.exh.3). On March 15, 1999, Stauffer learned that Westmoreland planned to pay her only $158,617 when she left the practice, much less than what she had expected (cplt.exh.6). Sometime after April 19, 1999, Stauffer's attorney wrote to defendants, stating that "[i]t is clear that Dr. Stauffer's rights as a shareholder of Westmoreland... are not being honored" and "it appears that the [doctor defendants], in breach of their fiduciary obligations and personal guarantees, have conspired to use Westmoreland as an engine of fraud to personally

benefit themselves at the expense of Dr. Stauffer and in derogation of the duties owed to her" (cplt.exh.15). And, finally, as of February 2000, Stauffer had enough knowledge to file this lawsuit against defendants. These facts establish that Stauffer had sufficient knowledge of her Illinois securities fraud claim more than six months ago. *See* Denten v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 887 F.Supp. 176, 180 n.8 (N.D. Ill. 1995) ("plaintiff's allegation that she became aware of violations of the securities laws is equivalent to her awareness of the legal consequences [*i.e.*, voidability] of [defendant]'s actions."); Kleban, 912 F.Supp. at 369 (holding that date of attorney's letter describing allegations of future complaint represented the date on which plaintiff had requisite knowledge under Section 13(B)'s notice provision). Stauffer has not yet filed a notice of rescission despite this prior knowledge. Therefore, count VIII is dismissed.

## C. Common Law Fraud

Count IV alleges common law fraud against all defendants. In Illinois, the elements of a common law fraud claim are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 591 (Ill. 1996). Stauffer's common law fraud claim does not suffer from the same timeliness issues that doomed her securities fraud claims. This does not mean, however, that all is well with count IV.

As we described above, the first two categories of alleged misrepresentations include statements made in 1990 and 1993 regarding how Stauffer's stock value would be calculated

in the event of her departure from the practice. In both March 1990 and August 1993, Stauffer was told that the 1989 agreements provided that she would receive her original contribution ($258,327) plus interest (6 per cent) if she left Westmoreland. The 1989 agreements do not contain such a method of calculating stock value (cplt. exhs. 2, 5). Stauffer argues that Westmoreland and the doctor defendants intentionally lied about her stock valuation in order to induce her to join the practice in 1990 and contribute into the partnership in 1993 (cplt.¶¶67-69). Stauffer also claims detrimental reliance (cplt.¶¶70-72). Generally, promissory statements of this sort cannot be woven into a common law fraud cause of action (see infra pp. 15-16). But, according to Stauffer, the doctors not only promised her certain payout benefits, but also informed her that those benefits were codified in the 1989 agreements (cplt. ¶¶ 14, 20). Stauffer also claims that she did not receive copies of the 1989 agreements until early 1999. Thus, with respect to the first two categories of alleged misrepresentations, Stauffer's allegations state a cause of action for common law fraud. We underscore the narrow nature of this claim -- it can proceed only insofar as it is based on the theory that Stauffer was informed that the 1989 agreements contained certain provisions when in fact those contracts did not include such clauses. As a further limitation, the claim can be brought only against Westmoreland and the doctor defendants, since Stauffer had no contact with either Leaf or Grasso until 1999 and did not rely on any of their statements prior to the time.[8]

In the third category of statements, Stauffer claims that defendants informed her that

---

[8]Stauffer claims that Leaf and Grasso were involved in drafting the 1989 agreements and the 1997 agreements, but she also admits that she did not receive copies of those agreements until 1999 and therefore she could not have relied upon them when deciding to join the practice or the partnership.

the 1997 agreements trumped the 1989 agreements, that under the 1997 agreements her stock value and deferred compensation amounted to $158,617, and that if she transferred her 250 shares to Westmoreland she would receive $158,617. These alleged misrepresentations cannot serve as the bases for a common law fraud claim. Defendants' position in this lawsuit is that the 1997 agreements govern their relationship with Stauffer. Stauffer disagrees, claiming that other contracts control. Defendants' position regarding which contracts govern is legal argument and not actionable fraud. Similarly, defendants' position regarding how much Stauffer is owed under the controlling agreements is part of the underlying contractual dispute, not a false statement of material fact. Finally, insofar as defendants promised to pay Stauffer $158,617 upon transfer of her 250 shares, and have reneged on that promise by remitting to date only one payment of $10,739, that alleged misconduct sounds in breach of contract and not in fraud. *See* Zankle v. Queen Anne Landscaping, 724 N.E.2d 988, 992-93 (Ill App. 2 Dist. 2000); Murphy v. Murphy, 59 N.E. 796, 797 (1901) ("A false representation, within the meaning of the law, must be a representation as to an existing or past fact, and not merely a promise to do an act in the future."); *see also* Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (7th Cir. 1993) ("Contractual breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages.").

Accordingly, with respect to Leaf and Grasso, count IV is dismissed in its entirety. With respect to Westmoreland and the doctor defendants, count IV is dismissed only to the extent that it is based on the third category of alleged misrepresentations.

## III. Intentional Infliction of Emotional Distress

In count V, Stauffer alleges intentional infliction of emotional distress against

Westmoreland and the doctor defendants. In order to sustain this cause of action, Stauffer must establish that defendants' conduct was extreme and outrageous, that defendants either knew or were substantially certain that their conduct would cause severe emotional distress, and that the conduct in fact caused severe emotional distress. *See* <u>Doe v. Calumet City</u>, 641 N.E.2d 498, 506 (Ill. 1994). Stauffer claims that Westmoreland and the doctor defendants have intentionally refused to honor their commitments to Stauffer and have paid her only a fraction of what she is owed, all while knowing that their conduct would make it difficult for her to provide for her child and impossible for her to afford an attorney (cplt.¶¶75-78).

We understand that Stauffer has had to endure financial hardship as a result of this dispute. But her allegations do not bring her within this narrow tort. Even assuming that everything Stauffer says about her injuries and defendants' conduct is true, there is not enough here to support an intentional infliction of emotional distress claim. Stauffer's complaint simply does not contain allegations of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." <u>Public Finance Corp. v. Davis</u>, 360 N.E.2d 765, 767 (Ill. 1976). Nor does it describe distress that "is so severe that no reasonable man could be expected to endure it." *Id.; see* <u>McNamara v. Guinn</u>, 2000 WL 1222128, at *5-6 (N.D. Ill. Aug. 23, 2000) (describing Illinois cases). Therefore, we must dismiss count V.

## IV. <u>Illinois Business Corporation Act</u>

Section 7.75 of the Illinois Business Corporation Act (IBCA) provides that "a shareholder of record shall have the right to examine ... the corporation's books and records" upon making an appropriate written request for inspection. 805 ILCS 5/7.75. In count VI,

Stauffer claims that Westmoreland and the doctor defendants did not comply with her request to review its corporate records and therefore are liable for the 10 per cent penalty fee provided under Section 7.75. 805 ILCS 5/7.75(d) (establishing "a penalty of up to ten per cent of the value of the shares owned" for failure to allow examination of corporate records).

Defendants point to many potential flaws with this claim. Not the least of which is that no federal court in this circuit has upheld an action seeking to recover the 10 per cent statutory penalty available under Section 7.75.[9] In any event, Stauffer cannot succeed with her IBCA claim because she did not timely file an appropriate demand for inspection on Westmoreland. Section 7.75(b) provides that "a shareholder of record" has a right to inspect business records if she makes a "written demand upon the corporation, stating with particularity the records sought to be examined and the purpose therefor." Stauffer alleges that she made a number of oral requests for corporate records, but only written demands count under Section 7.75(b). Stauffer cites to a letter sent by her attorney requesting documents from Westmoreland as evidence of a written demand (cplt.exh.15). Stauffer admits, however, that the letter was sent after she had already relinquished her shares in Westmoreland. Since she was not "a shareholder of record" at the time she made that written demand, she does not fall under the auspices of Section 7.75. Therefore, the IBCA claim contained in count VI is dismissed.

---

[9]Indeed, there is some doubt as to whether such an action would fall within the jurisdiction of a federal court. *See* Schaefer v. H.B. Green Transportation Line, Inc., 232 F.2d 415, 417-18 (7th Cir. 1956) (holding "that the demand for the penalty imposed by the Illinois statute for refusal to permit inspection was not enforcible [sic] in the [federal] district court."); Tasner v. U.S. Industries, Inc., 379 F.Supp. 803, 807-08 (N.D. Ill. 1974) (same). The statute itself provides that an aggrieved shareholder should seek recourse in state court, not federal court: "If the corporation refuses examination, the shareholder may file suit in the circuit court of the county in which either the registered agent or principal office of the corporation is located to compel by mandamus or otherwise such examination as may be proper." 805 ILCS 5/7.75(c). Whether a Section 7.75 action should be brought in federal court or state court, we agree with defendants that that provision of the IBCA was not designed for lawsuits such as this one.

## V. Service of Process and Pleading Deficiencies

Finally, we address two additional grounds for dismissal advanced by some of the defendants. First, defendants Albert J. Grasso and Chuhak & Tecson, P.C. argue that they should be dismissed from the lawsuit because Stauffer failed to serve process on them within 120 days of filing her complaint, as required by Rule 4(m). These two defendants are correct in that Stauffer filed her initial complaint on February 28, 2000, but did not serve process on them until 123 days later, on June 30, 2000. In addition to establishing the 120-day rule, however, Rule 4(m) provides that "if the plaintiff shows good cause ... the court shall extend the time for service for an appropriate period." Stauffer points out that she was proceeding *pro se* at the time and also notes that the process server attempted to serve Grasso and Chuhak on an earlier date but was unable to do so. Stauffer has established good cause for an extension of time with regard to service of process. Accordingly, we deny defendants' Rule 12(b)(5) motion to dismiss.

Second, defendants claim that counts I and VII do not comply with the pleading requirements of Rule 8(a). Specifically, defendants complain that it is unclear whether count VII is a claim seeking to hold the doctor defendants individually liable for the obligations of Westmoreland or, instead, a claim alleging corporate waste and mismanagement (def.br.at 27-28). In her response brief Stauffer clarifies that count VII is a traditional "piercing the corporate veil" claim in which she seeks to hold the doctor defendants personally liable for the debts and obligations of Westmoreland (plf.br.at 32-33). Thus, this issue is now resolved to the satisfaction of defendants. We, too, find counts I and VII acceptable. Defendants' motion to dismiss on Rule 8(a) grounds is denied.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are granted in part and denied in part as follows: Counts III, V, VI, and VIII are dismissed; Count IV is dismissed in its entirety with respect to Leaf and Grasso and dismissed in part as discussed above with respect to Westmoreland and the doctor defendants; Counts II and IX are dismissed without prejudice and Stauffer has leave to re-file those claims consistent with this opinion; defendants' motions are denied in all other respects.

JAMES B. MORAN
Senior Judge, U. S. District Court

May 25 , 2001.