

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1242 | **DATE** | 2/24/2003 |
| **CASE TITLE** | Christine F. Stauffer etc. Vs. Westmoreland Obstetric etc. et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for partial summary judgment is granted in part and denied in part, and defendants' summary judgment motion is granted in part and denied in part as to count I, granted as to counts II and III, and granted as to the counterclaim. What remains are counts IV and V, and the breach of oral contract claim as limited by this opinion. Status hearing set for March 20, 2003 at 9:15am.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | FEB 26 2003 date docketed | |
| ✓ | Docketing to mail notices. | | | 114 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| WAH | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE F. STAUFFER, f/k/a CHRISTINE F. SKORBERG, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 00 C 1242 |
| WESTMORELAND OBSTETRIC AND GYNECOLOGIC ASSOCIATES, S.C., et al., | ) ) ) ) | DOCKETED |
| Defendants. | ) | FEB 2 6 2003 |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Stauffer bring this action against defendants Westmoreland Obstetric and Gynecologic Associates, S.C. (Westmoreland), Hugh Falls, William Gardner and Scott Logan alleging breach of contract, conversion, fraud, willful and wanton conduct, and breach of fiduciary duties. He now moves for partial summary judgment and defendants bring a cross-motion for summary judgment on the complaint and counterclaim and move to strike expert testimony. For the following reasons, plaintiff's motion for partial summary judgment is granted in part and denied in part, and defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

On March 3, 1990, Christine Stauffer (Christine) and Westmoreland entered into a written employment agreement (1990 employment agreement). This agreement included a provision that Christine could purchase an equal ownership interest in Westmoreland after three years at the practice and that her salary would be equal to that of other shareholders.



Plaintiff[1] alleges that oral representations were made at some time that included assurances that any shares purchased by Christine would be bought back when she left at the same amount she paid for her buy-in (cplt., ¶10).

In August 1993, Christine exercised her option to purchase an equal interest in Westmoreland. At that time, Westmoreland's accountant calculated the amount she would pay to buy in: $258, 327 – which was paid by Christine through bonus and salary reduction over the next three years. Allegedly, Hugh Falls, William Gardner and Scott Logan (doctor defendants) promised at that time that Christine would immediately become an equal shareholder, that she would be given a loan from Westmoreland to buy her shares, and that all major practice decisions would be made only with complete shareholder consensus. The individual doctors also allegedly reiterated their promise that Westmoreland would buy back Christine's shares for the amount she paid for them, plus 6 per cent annual interest, if she were ever to leave the practice. Christine claims that the doctor defendants personally guaranteed the arrangement and assured her that there were written documents governing her stock purchase and potential sale-back which supported the statements they were making.

Christine's last day of employment with Westmoreland was February 28, 1999. On March 15, 1999, Westmoreland informed Christine that she would receive $29,753 for her shares and $128,864 in deferred compensation benefits. Plaintiff claims that Christine is owed substantially more. To date, Christine has received $10,739 in connection with her departure. Since the filing of this lawsuit, Christine has assigned all her rights in the suit to her husband John Stauffer, who is now proceeding as the plaintiff.

---

[1] Whenever we refer to plaintiff, we mean, for convenience, Christine.

## DISCUSSION

Motion to Strike

As a preliminary matter we address defendants' motion to strike plaintiff's expert witness affidavit. In support of his summary judgment motion and his response to defendants' motion, plaintiff has filed "John Stauffer's Expert Witness Affidavit." Before John Stauffer had assumed the role of plaintiff here, he was identified as an expert in the areas of contract law, corporation law, and accounting. Defendants have already deposed plaintiff and in preparation for that deposition requested any expert report that he had. The parties agree that no report was, or has been, provided.

Defendants assert that plaintiff's expert affidavit was not disclosed in accordance with Federal Rule of Civil Procedure 26(a) and is barred by Rule 37. Rule 37(c) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or Rule 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence on a motion any witness or information not so disclosed." Rule 26(a)(2)(B) lays out what an expert witness report must contain and 26(a)(2)(C) states that these disclosures shall be made at least 90 days before trial, or the date the case is to be ready for trial, unless the court directs otherwise. Plaintiff's affidavit, titled an expert affidavit, provides much of the information required under 26(a)(2)(B), and offers expert testimony on accounting principles and medical financial statements. At the same time plaintiff insists it is not an expert report and should not be scrutinized as such. Our solution at this point is to consider the opinions offered in plaintiff's affidavit as extensions of his arguments in his briefs rather than as expert testimony. If plaintiff chooses to submit an expert opinion under Rule 26 on the issues unresolved by this

opinion, we will address any objections and/or costs of a second deposition at that time.

## Motion for Summary Judgment

Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We draw all inferences and view all admissible evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## Breach of Contract (Count I)

Plaintiff's breach of contract claim is based on the alleged failure of Westmoreland to correctly calculate and distribute the amount owed to Christine at the time of her departure from the corporation. Defendants admit that Christine is still owed money from her departure, but assert that it is a substantially smaller amount than that calculated by plaintiff. They thus move for summary judgment on this claim. We look at each of the contested payments in turn.

## Stock Purchase

On May 1, 1996, Christine and defendants entered into a written contract in which they agreed that the corporation would issue 250 shares of the common stock to Christine and that she would sign on as a party to the 1989 Stock Purchase Agreement (SPA) (amend. to SPA, ¶C). The SPA provides that the price paid for shares to a shareholder/employee who terminates employment is the agreed value of the shares on the termination date (SPA §7.2). It further states that "unless and until a new agreed value is established in the manner herein provided, the Agreed Value of each one of the Shares to be purchased shall be the Book Value

per Share as determined in accordance with the provisions of Section 7.4" (SPA §7.3). Under the SPA, the parties could only establish a new agreed value of the shares "upon their filing with the Secretary of the Corporation a Certificate of Agreed Value...dated and signed by each of the parties." *Id.*

Plaintiff argues that the agreed value of Christine's shares was established before the signing of the SPA amendment, when she was allegedly told that the corporation would purchase her stocks for the same amount she paid for her equal interest in the corporation. But the SPA is a fully integrated contract covering the purchase price of shares at employment termination, and any offers or negotiations of purchase price made before Christine's signing of the SPA amendment were superseded by that document. Barille v. Sears Roebuck and Co., 289 Ill.App.3d 171, 176, 682 N.E.2d 118, 123 (1st Dist. 1997). We are, accordingly, restricted to the terms of the SPA.

Under the SPA, the valuation date "shall be...in the case of a purchase resulting from the termination of employment of a shareholder, the date of the termination of employment" (SPA sec. 7.3(e)). Plaintiff asserts that the valuation date of Christine's shares was the date of her buy-in as an employee/shareholder since Westmoreland's accountant Bob Leaf (Leaf) had to value her share to determine the amount she would contribute at that time. We agree that Leaf must have put value to the 250 shares of stock in determining Christine's buy-in amount.

But the SPA, by its terms, governs the purchase of a member's shares by the corporation when a member terminates his or her relationship with the corporation, not the buy-in by a physician. The employment agreement does provide the means of valuation by referencing the SPA, but the employment agreement does not adopt a procedure for filing a certificate of agreed value upon a buy-in, nor was one ever filed. Rather, it provides, by reference, for

valuation at book value.

So we are left with the question: what was the book value of Christine's shares on February 28, 1999?

> The Book Value per Share shall be determined by dividing the Book Value of the Corporation on the applicable date by the number of issued and outstanding common shares of the Corporation as of such date. The term "Book Value of the Corporation," as used herein, shall be an amount equal to the amount of the Corporation's assets, less the amount of its liabilities, on the applicable date as reflected by balance sheets which have been or shall be prepared...in accordance with generally accepted accounting principles consistently applied..."

SPA, Section 7.4.

Leaf prepared a statement of financial condition as of February 28, 1999, in which the assets listed totaled $826,055 and the liabilities were $572,090. Under the formula of section 7.4, then, the book value of the corporation at that time was $253,965 – $253.97 per share – and Christine's 250 shares had an agreed value of $63,491.25.

Using the same provisions of section 7.4 and the same valuation date, defendants come up with a different amount for the agreed value, $29,753. Their reasoning is that accounts receivable should not be included in the assets amount since Christine was to receive her percentage of accounts receivables as deferred compensation. Excluding accounts receivable from book valuation calculations is the method required under the corporation's 1997 Stock Redemption Agreement. But Christine did not sign the 1997 agreement, and the parties agree that it is the 1989 SPA that controls. Just as plaintiff is bound by the clear terms of the SPA, so are the defendants. Valuing accounts receivable at zero is not one of the adjustments required or allowed under section 7.4, and Christine is accordingly owed $63,491.25, plus pre-

judgment interest.[2]

## Deferred Compensation

In addition to the stock purchase proceeds, the parties agree that Christine should receive deferred compensation under a 1989 Unfunded Deferred Compensation Agreement (UDCA). Under the UDCA, Westmoreland was to establish and maintain a book account in the names of individual employees, in which it credited deferred compensation as calculated under the agreement:

> 3.1 <u>Determination of Amount</u>
> (a) <u>Initial Amount</u>. The initial amount credited to the Account shall be equal to:
> (1) The accounts receivable of the corporations as of the date of the Employee's termination of employment which are not more than 180 days aged as of such date, divided by the number of then equal shareholders of the Corporation; and
> (2) Fifty percent (50%) of such accounts receivable which are more than 180 days aged, as of the date of termination, divided by the number of then equal shareholders.

UDCA, section 3.1

At the time Christine was hired, section 3.1 also contained a provision that an employee would receive a percentage of the average gross fee income of the corporation as supplemental compensation (UDCA 3.1(b)). This provision was deleted by a 1993 amendment to the UDCA.

The first issue presented by the parties is whether the accounts receivable amount used for the calculations under 3.1(a) should be adjusted for insurance company discounts. Westmoreland's February 28, 1999 statement of financial condition lists:

| | | |
|---|---|---|
| Accounts Receivable | 817,272 | |
| Less, Allowance for Contractual Insurance Company Discounts | (245,182) | 572,090 |

---

[2] Plaintiff contends at various times that she should not have had to pay for accounts receivable because, due to the deferred compensation plan, they were assets of the doctors, not the corporation. She is mistaken. They were assets of the corporation, a portion of which could be payable to a physician upon his or her termination of the relationship with the corporation.

The $572,090 amount is listed in the totals column and is the number that is added to the other corporation assets to reach a total assets amount. As explained by plaintiff in his reply brief, there is a gap between what Westmoreland believes is the usual and customary fee for each performed service and what the insurance contracted price is for each service. This gap is reflected in the balance sheet, the higher number (817,272) representing the total amount Westmoreland would bill using its independent fee scale and the lower number (572,090) representing what it can actually expect to receive taking into account that some or all of the services were billed to insurance companies. Plaintiff argues that listing the higher number as accounts receivable overly inflates the corporation's assets, in contravention of general accepted accounting procedures. But the 572,090 figure is the amount listed in the balance sheet's far right column and the number used to calculate the corporation's total assets. While plaintiff may take issue with the soundness of providing the background math used to reach the final amount on a financial statement, he does not appear to dispute that it is the accounts receivable that are actually expected to be recovered that are the true asset. $572,090 was the amount expected to be received by the corporation, and it is the amount that should be used in the formula to calculate deferred compensation under section 3.1(a) of UDCA. That figure has to be further adjusted to reflect the aging of accounts receivable, as provided in section 3.1. That calculation is reflected in the accountant's schedule, Exhibit 6 to the Amended Complaint. While plaintiff suggests that the figures there, as well as in other calculations, such as the buy-in computation, are suspect, we are not provided with any real basis for disputing figures supported both by exhibits and testimony. $515,456 is the appropriate accounts receivable figure for determining deferred compensation.

Next we look to whether Christine was owed any supplemental compensation under the

UDCA. In determining Christine's deferred compensation, Westmoreland's accountant followed the amended version of the UDCA and as a result she was offered no supplemental income.

Plaintiff argues that defendants should have applied the pre-amended version of the UDCA since she never agreed to the changes in the 1993 amendment. Defendants counter that Christine was not a party to the 1989 agreement and her consent was not needed to amend the contract.

The 1989 UDCA and the 1993 amendment are contracts that were executed on an individual basis between Westmoreland and either an employee or a shareholder (pl. exhs. 5 and 23). There is no evidence that Christine signed either document or even knew of their existence until 1999. She is not a party to the UDCA, and her consent was not needed to change its terms. Even viewing her as a third party or incidental beneficiary because of defendants' equal pay obligations, we cannot find that she justifiably relied on the original terms of the document to her detriment since she was not aware of it until after it was amended. She is not in a position to contest the 1993 amendment, and the supplemental income provision of the original document is not available to her, just as it is not available to the other doctors. Plaintiff is entitled to $128,864 for deferred compensation.

Termination Pay

We now turn to specific provisions of Christine's 1990 Employment Agreement. The written contract provides that Christine would be entitled to one month's severance if she was terminated by Westmoreland (¶10). It reads as follows:

> 10. Termination. This Employment Agreement may be terminated by either Employer or Employee upon giving 2 weeks written notice to the other party. In the event that Employer gives such notice, Employee shall be entitled to one

month's add'l salary upon termination.

Christine informed defendants that she was planning to move out of state and submitted a resignation letter in November 1998, but testifies that she verbally retracted this resignation within a few days of its tender so that she could continue working as a shareholder/employee until she was able to sell her house. She did continue to work and was compensated as a shareholder/employee for the next two and-a-half months. On February 1, 1999, defendants sent her a letter stating: "Based upon your decision to resign which you announced to us last November, we accepted your resignation effective as of February 28, 1999."

Plaintiff argues that the defendants gave notice because they set the time for departure. They counter with the explanation that they had to have a definite time because of the impact of her leaving upon patient scheduling and that they offered her the opportunity to continue on a defined schedule and for a defined compensation.

We think the only reasonable interpretation is that the additional salary turns on who initiated the termination. Christine initiated it and left no doubt that she was leaving, but the timing was changed by her to the uncertain date she sold her house. If, to change the scenario, the defendants had asked her to leave but set the termination date two months later, and she, because of an alternate opportunity, decided to leave somewhat earlier, we have no doubt that she would be contending, quite rightly, that she was entitled to termination pay. We grant summary judgment on this claim to the defendants.

Equal Pay

The 1990 employment contract also provides that once Christine exercised her option to purchase an equal interest in the corporation she was entitled to a salary equal to that of the other shareholders (¶13). The parties agree that Christine exercised her option to purchase an

equal interest on August 1, 1993. Plaintiff asserts that the compensation amounts listed in defendants' tax returns show that Christine was not being paid equally after that time. The defendants counter that the compensation totals in the returns are misleading since they don't reflect pure salary but take into account that Christine's bonuses and salary were adjusted for her share purchase and that each shareholder's salary reflected life insurance policy premiums of differing amounts. Plaintiff replies that the adjustments reflected on the tax returns were made incorrectly – first, that the amount removed from Christine's salary to pay for her buy-in was too large, and second, that any differential in life insurance premium cost should be made up for in payment to those employees who were less costly.

The only written documentation of Christine's buy-in amount currently in the record is the buy-in payment schedule created by Leaf in August 1993, which confirms the $258,327 amount and provides how this amount will be (and was) removed from Christine's salary and bonuses over the next three years. Plaintiff alleges that the $258,327 amount was reached incorrectly but, for the reasons previously stated, we think that cannot be reasonably disputed. Without question, plaintiff received less cash salary than her colleagues for a period after her execution of the option to purchase shares. But plaintiff's exhibit 12 makes clear that she paid for her shares by a reduced salary, together with bonuses and an automobile allowance. Plaintiff does not dispute that she had an obligation to pay for her shares, although she disputes (we think without sufficient support) the amount she was required to pay. She bought a share in the accounts receivable and she is entitled to recover her share of the accounts receivable upon termination. Indeed, that interest is recognized in the stock valuation and again in the deferred compensation. It is evident that the accounts receivable decreased over time, that the business had become less profitable, but we note that the record establishes that the recoverable

accounts receivable have been impacted by an increasing disparity between defendants' view of what is a reasonable and customary fee and what insurance companies are willing to pay. How that reduced salary was treated for tax purposes and whether that treatment was appropriate are not matters before the court. We conclude that plaintiff received equal pay, with two possible exceptions: life insurance premiums and vacation time.

In the 1990 employment contract, Christine's entitlement to life insurance is described as a benefit separate from her right to equal salary. Plaintiff alleges, however, that the written contract was modified when defendants agreed to give her monetary compensation to make up for the inequality in vacation time and life insurance premium costs among the shareholders. Whether Christine should have been compensated for the lesser cost of her life insurance policy (as well as lesser vacation time) turns on whether the parties orally modified their agreement in 1993. Since the alleged modification is in dispute, we cannot decide this issue on summary judgment.

What is left of count I are the remaining allegations of oral modifications of the 1990 employment agreement. Plaintiff specifically asserts that Christine agreed to stay on at Westmoreland and buy in as a shareholder, and in exchange the corporation promised to give her a loan to purchase shares to be repaid over the next three years, making her an equal shareholder as of that date; to buy back her shares when she left for the same amount she paid for her equal interest in the corporation, plus 6 per cent interest; to keep her buy-in money in a separate money market account; and to require that all major decisions of the corporation be made only with the consensus of all the shareholders. As discussed above, there are no provisions in the 1990 written contract regarding the purchase price of Christine's shares in the event of her termination, and any promises made regarding that future transaction were

superseded by the 1996 amendment to the SPA signed by the parties. To the extent that the allegations are not made moot by the rest of our decision, however, the breach of oral contract claim respecting insurance premiums and vacation time can go forward.

Conversion (Count II)

In his conversion claim, plaintiff alleges that Westmoreland is now in possession of the 250 shares of stock that Christine transferred back to the company, as well as the money she is allegedly owed for the shares. Some of this claim has been made moot by our determination of the amount Christine is owed for her stocks under Article VII of the SPA. But plaintiffs reiterate their assertion that defendant doctors promised that the money Christine paid for her buy-in would be kept in a separate money market account earning at least 6 per cent interest and would be returned to her when she left Westmoreland. Defendants insist that there is not nor was there ever such a money market account and have filed affidavits to support their position. Plaintiff has offered no evidence to show that there is an actual account. Without identifiable property, plaintiff's allegations of misrepresentations regarding a separate money market account, and the terms of a stock purchase buy-back, do not make a conversion claim. Defendants alleged promises are best addressed under plaintiff's breach of contract claim.

Fraudulent Misrepresentation (Count III)

Plaintiff's fraud claim is based on the alleged statements made by defendants that the 1989 SPA and UDCA provided that Christine would receive her original contribution ($258,327), plus 6 per cent interest, if she left Westmoreland. Defendants' current challenge to this claim is that plaintiff has offered no evidence that Christine justifiably relied on their statements regarding the 1989 documents – one of the required elements of a fraud claim. *See generally* Cannock v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 591 (Ill. 1996). Plaintiff counters

that defendants inappropriately claim lack of justifiable reliance in the face of allegations that they deliberately misrepresented the terms of the written contracts.

Here we have alleged oral representations regarding provisions of written contracts–representations that are clearly contradicted by the written documents themselves. Christine agreed to the terms of the SPA when she signed the 1996 SPA amendment. "A party who could have discovered the fraud by reading the contract, and in fact had an opportunity to do so, cannot later be heard to complain that the contractual terms bind her." Regensburger v. China Adoption Consultants, Ltd., 138 F.3d 1201, 1207 (7th Cir. 1998) *citing* Pierce v. Atchison, Topeka and Santa Fe Ry. Co., 65 F.3d 562, 569 (7th Cir. 1995). Plaintiff's argument that we must further flush out the circumstances is not aided by West v. Western Casualty and Surety Co., 846 F.2d 387, 394 (7th Cir. 1988). The critical (and undisputed) factors present here and absent in West are that the alleged representations described provisions in the SPA and UDCA, that the SPA contradicts these representations, and that Christine agreed to be bound by the terms of the SPA. There is nothing in the record of which we are aware that suggests that Christine was impeded from viewing the SPA when she signed the 1996 amendment, and accordingly her reliance on defendants' alleged representations regarding its content is unjustified.[3]

Personal Liability (Count IV)

Defendants argue that as a matter of law there is no reason to pierce the corporate veil in this case. They summarize plaintiff's claim as allegations that defendant doctors improperly

---

[3]We note, as well (although not as a basis for the ruling), that the claimed misrepresentations would have been as obvious to one reading the presumably readily available SPA as to cast some doubt on the likelihood that they were made and were inconsistent with the concept of equal pay, since the other doctors were bound by the SPA.

amended the 1989 SPA and UDCA without following corporate protocol and obtaining unanimous consent to the changes. But the allegations in the complaint and elaborated in plaintiff's response to the cross-motion are broader than this, they allege fraud, deducting personal expenses from corporate assets, and failing to follow corporate protocol in other major business decisions at the expense of Christine and the corporation. We recognize that defendants have not yet had a chance to respond to the arguments in plaintiff's response, but with the information currently before us we find this claim is not ripe for summary judgment.

### ERISA violation (Count V)

During her employment, Christine participated in a profit-sharing plan and a 401(k) plan offered by Westmoreland. In August 2000, she requested the rollover of the money she held in the plans. Plaintiff claims that defendants violated ERISA when they failed to advise Christine that rolling over her portion of the plan benefits mid-year would cause her to forfeit participation in the plans for that year. Defendants contest this claim arguing that Christine knew this information since it was contained in the summary plan description given to Christine by Westmoreland's office manager. Plaintiff now disputes that Christine was ever given this plan summary. There is a genuine issue of material fact here, and liability cannot be determined at this stage if liability turns on whether or not she was given the plan description.

Defendants also challenge the assignment of Christine's ERISA claim to her husband as contrary to ERISA's bar on alienation or assignment of rights as a plan participant. The situation here, however, is that Christine's litigation rights were assigned to her husband. It is on behalf of her rights that he is litigating, and any recovery will go to her as the plan participant. The nonassignment clause of the ERISA plan is not implicated.

Counterclaim

Defendants' counterclaim also concerns the profit-sharing and 401(k) plans. The money in both plans was invested by The Northern Trust. At the time of the rollover of Christine's portion, The Northern Trust transferred $242,999.21 to Christine. Defendants claim that she received $55,426 more than what she should have received since her account balance in the two plans was $187,573.21 ($132,142.21 in the profit-sharing plan and $55,426 in the 401(k) plan) at the end of 1999. Plaintiff admits that Christine received the $55,426 amount twice, but says that she should keep this amount to offset the portions of her plans that she did not receive as a result of defendants' alleged breach if fiduciary duty. Plaintiff may be entitled to damages under his ERISA claim, but this is a separate issue from the admitted overpayment by Northern Trust. Defendants are entitled to summary judgment on their counterclaim, in the amount of $55,426, together with prejudgment interest.

We recognize that in the midst of the briefing on these motions plaintiff filed an amended motion for partial summary judgment on the same day that defendants filed their response to plaintiff's original motion. In the parties' status with the court on November 20, 2002, we asked defendants to wait on filing a response to plaintiff's amended motion and reply in support of their cross-motion for summary judgment until we had a chance to sort through the briefs before us and determine if more argument or information on behalf of defendants was necessary. In light of the findings in this opinion, we give defendants an opportunity to respond to plaintiff's arguments where appropriate.

## CONCLUSION

For the reasons above, plaintiff's motion for partial summary judgment is granted in part and denied in part, and defendants' summary judgment motion is granted in part and

denied in part as to count I, granted as to counts II and III, and granted as to the counterclaim. What remains are counts IV and V, and the breach of oral contract claim as limited by this opinion..

　　　　　　　　　　　　　　　　　　　　　　　　　　　*/s/ James B. Moran*
　　　　　　　　　　　　　　　　　　　　　　　　　　　JAMES B. MORAN
　　　　　　　　　　　　　　　　　　　　　　　　　　　Senior Judge, U. S. District Court

_Feb. 24_, 2003.